Good morning, Illinois, public court 1st district court is now in session. The 4th division. The honorable justice Bertina lampkin presiding case number 2, 1 dash 1, 6, 3, 8. Andrew Levenfield versus Marine O'Brien. Good morning council. This is a very interesting case. I'm going to start out by saying that we normally give you 15 minutes. We're going to let you take more. We will. I am certain interrupt you doing your presentation. So. Don't take offense and you can, we'll let you continue until you. Finish your case who for the apple lot. How much time do you want for a rebuttal? Good morning, your honor. I would like to reserve 3 minutes for rebuttal. Please. All right, thank you then whenever you're ready count. Oh, I guess I should have you identify. Yourself for the records. I know both of your names and your faces, but identify yourself please for the. Thank you. Your honor John Fitzgerald for the appellants. Dan and Maureen O'Brien. Good morning. Your honor Jeremy voter on behalf of the plaintiffs and appellees enter W. Levenfeld and associates limited and Stephen J. Schlegel limited. Thank you. All right. Mr. Fitzgerald whenever you're ready, you can start. Thank you. Your honor. May it please the court. The judgment against Dan and Marine O'Brien should be reversed for 3 reasons. 1st, a lawyer should not be allowed to violate rule 1.5 E. And then on a theory of quantum Merowith. Obtain exactly the same economic benefit he would have received. If the rule never existed that would reduce the rule to a mere guidepost. And we know from foreman versus Alberts and from our Supreme Court's opinions in the storm and in SPAC cases. That rule 1.5 is not just a goal, a guidepost. It has the force of law. The whole point of rule 1.5 is to ensure that clients receive full disclosure up front about the representation so that they can make an informed choice. The rule embodies the state's public policy of placing the rights of clients above and beyond any lawyer's remedies in seeking to enforce fee sharing agreements. That public policy should not be subverted by allowing lawyers who violate the rule and who therefore can't enforce their fee sharing agreements to obtain exactly the same outcome under a theory of quantum Merowith. And the violation of rule 1.5 in this case was no mere technicality. It was the most extreme violation of rule 1.5 E that you could possibly imagine. The plaintiffs agreed to divide their fees, but they decided to postpone any decision on what that division would be until the end of the case. So they apparently planned either never to tell Dan and Maureen O'Brien what that division would be or at best to present. So counsel, I don't want to interrupt you, but we know the facts of the case. Could you get to the issue of why, whether number one, the plaintiffs were entitled to a judgment on quantum Merowith and number two, if they were entitled to a judgment on quantum Merowith, why, in your opinion, the circuit court erred by enforcing the contingency clause of an unenforceable contract? Yes, Your Honor. So the plaintiffs do not deserve any award in quantum Merowith because they never benefited the O'Briens in any way. And that's the second issue that we raise in our appeal. So that's the answer to the court's question. The circuit court's finding that there was some benefit to the O'Briens, which, of course, is an element of any quantum Merowith claim. That was against the manifest weight of the evidence. The plaintiffs achieved no benefit for the O'Briens at all. But to answer the court's question, why is a matter of law? Should the contingency not be enforced? The answer is provided, the answer is simply that as a matter of law, a lawyer shouldn't be able to escape the consequences of their unethical conduct by, ironically, seeking relief under a doctrine of equity. And the California Supreme Court in Chambers versus Kay faced exactly this issue. And the California Supreme Court, which has a substantially identical rule, unanimously found a lawyer can't indirectly enforce the contingency under a theory of quantum Merowith because that's just circumventing the rule and achieving exactly the same outcome under a doctrine of equity. And allowing that to happen subverts the whole public policy behind Rule 1.5, which is giving clients full disclosure and allowing them to make a meaningful choice up front so that they can decide whether to move forward with the proposed representation. And so in the California Supreme Court's decision in Chambers versus Kay, again, interpreting a substantially identical rule, it upholds the same public policy that we have here in Illinois, a public policy that's embodied in the Forman case, in Stormont, in SPAC, and that public policy is upholding the client's right to make an informed choice, to full disclosure about the economic realities behind the proposed representation. So I don't think your opponent disputes the fact that the contract is unenforceable. Correct. Violation 1.5, they can see that. So why it's unenforceable, you know, it is what it is. The question becomes, are you entitled to enforce any provision of an unenforceable contract when awarding damages under quantum Merowith? I mean, it's as simple as that. And the answer is no. The answer is no, because that would subvert the entire public policy that makes the contract unenforceable in the first place. It's really kind of a circular thing. We have a public policy. Everyone agrees we have a public policy embodied in Rule 1.5e. That makes it impossible for the lawyer to enforce the contract. Everyone agrees on that. And allowing the lawyer to achieve the same result indirectly just by pursuing a quantum Merowith claim that is, again, referring to exactly the same unenforceable agreement. Again, that's just achieving exactly the same result under a different label, and it defeats the same public policy in exactly the same way that enforcing the contract itself would. And it's important to remember this was not a case where the circuit court got to the number by looking at ours or by looking at something else. The plaintiffs here exclusively requested, and they got a quantum Merowith report that was solely based on the contingency, not on anything else. So again, that's just defeating exactly the same public policy that we have behind Rule 1.5e. And as a matter of law, that should not be allowed. And so that's what we're saying. And I would like to talk about how the plaintiffs never conferred any benefit at all on the O'Briens. And as we all know, that's an element of a quantum Merowith claim that's shown in the Supreme Court's opinion in First National Bank of Springfield versus Malpractice Research. It's shown in the Bernstein and Grazian case. It's shown in every case. You have to prove some measurable benefit, some tangible benefit to the client. Here there was not. All settlement offers were withdrawn before the plaintiffs were fired. And when the plaintiffs were on the case, they never got a settlement offer that was even reasonable. Every settlement offer that the plaintiffs got would have rendered Maureen O'Brien homeless. That was a non-starter. The plaintiffs never got a settlement agreement that was even in the ballpark of being acceptable. And again, all settlement offers were withdrawn before the plaintiffs were fired. In addition, the plaintiffs. If my recollection serves me, I thought they got an offer for like over 15 million while they were represented by the firm. Maybe Maureen in that offer would have lost her home. She would have lost her home, Your Honor. And so it was a non-starter. And ultimately, another attorney got the O'Briens a very different deal that saved Maureen's home, which is something that the plaintiffs never, ever achieved for the O'Briens. And again, all settlement offers that the plaintiffs ever made, they were all withdrawn. So before the plaintiffs were fired, while the plaintiffs were still on the case, the other side, Mr. and Mrs. Schultz, they went back down to zero. They withdrew any settlement offer that they ever made. So even the settlement offer that Your Honor mentioned. First, it was a non-starter because Maureen would lose her home. But even that offer was withdrawn before the plaintiffs were fired. And beyond that, the plaintiffs never achieved a single legal ruling in the O'Brien's favor. They never took a single deposition of any witness. They never obtained any professional valuation of the assets. And that was catastrophic. The plaintiffs entered into settlement negotiations without any clue as to the value of what they were bargaining away. And they gave Maureen O'Brien catastrophically bad legal advice when they told her to resign as co-executor of her parents' estates. When Maureen resigned as co-executor on the plaintiff's advice, she gave up very important rights, and she got nothing in exchange for giving up those rights. And so the plaintiffs really achieved no benefit at all for the O'Brien's. They can't point to a single legal ruling, a single admission they ever got in any testimony because there never was any testimony. And again, all settlement offers, they were all non-starters. They would render one of the two clients without a home, and even those settlement offers were all withdrawn. So there's no benefit at all. How soon after the discharge of the plaintiffs was the case settled? Approximately two months, rather. So you're suggesting to me that a case is settled two months after the plaintiffs were to the ultimate success on the part of your client. Correct, Your Honor. And I said approximately two months. It may have been a bit more, but the answer is correct. And we know that in a few ways. First, it's undisputed. All settlement offers were withdrawn by the other side. So when the new lawyer picked up, he was starting from zero. Everything had been withdrawn. And again, even if the old offers had been put back on the table, they were all non-starters. They all would have rendered Maria O'Brien homeless. And it was the plaintiff's burden. They wore the burden to show that they were entitled to some credit, that they caused the ultimate settlement. And there's no evidence that they ever caused the ultimate settlement. There's no evidence. Caused or contributed to. There's a difference. I think they had to at least prove that they contributed to it. I think caused is probably correct. But they can't even prove that they contributed to it. There's just no evidence of that at all. Again, the new lawyer, who unfortunately he passed away before the trial of this case, James Gover, he achieved the ultimate settlement here. But no one could testify that the plaintiffs here contributed to or caused in any way the ultimate settlement. No one testified to that. The Schultz's never testified about the thinking behind their decision-making process. Their attorney, Mr. Wenzel, never testified either. There's no evidence. There's no testimony. There's no other evidence beyond speculation and conjecture that the plaintiffs contributed to the ultimate settlement. And again, the Supreme Court's opinion in the first National Bank of Springfield case is really instructive here. That was a case where a litigation consultant was hired to work for a plaintiff in a medical malpractice case. There was no dispute. That consultant did research. That consultant wrote reports and sent the reports to the plaintiff's attorney. And the Supreme Court said there's no evidence that any of those reports were used or that they contributed to the ultimate settlement of this medical malpractice case. So the consultant took nothing in quantum merit. The consultant couldn't prove that the settlement of that case was caused by or that the reports contributed to the settlement of that case. And I would say this case is very similar to that one. Mr. Fitzgerald, what about the amount? I can't remember the highest amount that the plaintiffs got an offer. It was close to 16. I think close to 16. And then you settle for less than 17 million. Couldn't the fact that the figures were so close imply that they had moved the... I'll say their names because I can't think of the dial. Peggy and Richard from their 15 something up. Because, of course, the lawyer who took over would have known those were the offers that were extended. And I think the answer is that that itself is not enough of a basis. It's not a valid evidentiary basis. And again, the real starting point when the new lawyer, Mr. Koch, took over, it was zero. Because even that offer that your honor referred to, it was taken off the table. And so the new lawyer truly was starting from scratch. And so there's no basis to link the prior settlement discussions to the ultimate settlement. By contrast, there's a case called Wepner. Wepner versus Arnold. In that case, the lawyer who sought recovery in Quonset, Meriweth produced an affidavit from his opposing counsel, a lawyer named Mr. Azuki, who signed an affidavit saying, I advise my client to settle based on this lawyer's work. That's the kind of evidence that can support the conclusion that a lawyer is responsible for some ultimate settlement. Here, there was nothing like that. We had no testimony from the Schultz's, no testimony from Mr. Wenzel, no testimony from any witness who could testify to why the Schultz's eventually settled on the terms that they did. And so there's no evidence to support the notion that the plaintiffs conferred any benefit at all on the O'Briens. And I can't emphasize enough, 19 months passed between the signing of the engagement letter and the date that the plaintiffs here were fired. In that time, no depositions, no legal rules in the O'Brien's favor. The plaintiffs truly did nothing to help the O'Briens. The only thing that they did was catastrophically bad. And that was advising Maureen O'Brien to give up her rights as co-executor of her parents' estates. So there is no connection between anything that the plaintiffs here achieved and the ultimate settlement of the case when Mr. Koch was representing the O'Briens. And so, and I would also point to the Bernstein and Grazian case. That was a case where a lawyer, Mr. Bernstein, it was undisputed. He performed work on some cases where ultimately there were some recoveries and he pursued a claim in Quonset, Maryland. In that case, I believe it was Judge Mackey who said, I'll award Mr. Bernstein 10% of the recoveries on those cases because he worked on them. And eventually there were recoveries. And this court reversed because there was no benefit. There was no evidence connecting any work that Mr. Bernstein did and any recoveries by any of those clients. And the same outcome is warranted here. There's just no evidentiary basis to give the plaintiffs credit for an achievement of Mr. Koch. We cite a case called Seidenlaw v. Siegel. Counsel, you're burning up your time just regurgitating cases we've been reading and citing in your brief. So here's my point. A lawyer can't take credit for something that another lawyer achieved. We know that James Koch negotiated the settlement that actually happened here. There's no evidence connecting anything, any achievement, any success, any meaningful work that the plaintiffs did here on the ultimate settlement. And you can see in the settlement correspondence, do the plaintiffs say, you should accept our settlement offer because we got this damning admission from a witness, or because we discovered the smoking gun document, or because we achieved this ruling in the O'Brien's favor? No. The settlement correspondence, which is in evidence, is totally bare bones. They just said what the O'Brien's were willing to take. The plaintiffs never enhanced the O'Brien's position or did anything that could be deemed to have contributed to a settlement that another lawyer achieved months later. And so again, we raise, I'm not sure if I'm out of time, but I'm near the end. So again, as a matter of law, the judgment should be reversed. We ask this court to vindicate the fundamental Illinois public policy behind Rule 1.5e, which again would be defeated if this recovery were allowed. In addition, the circuit court had no basis to find that anything the plaintiffs did here benefited the O'Brien's. Thank you. Thank you. Anything further, Justice Hoffman or Justice Martin? Not at this time. Okay. Mr. is it Boulder? It is, Your Honor. Yes, and thank you. And good morning again. May it please the court. Okay. Defendants wrote in their own reply brief. Clients cannot take advantage of a lawyer's services to obtain a settlement offer, then discharge the lawyer immediately before acceptance for the sole purpose of circumventing an otherwise valid contingency agreement. Yet the defendants have attempted to do exactly that. They fired my clients. Wait a minute. Let's slow down. You're contending the contingency agreement was valid? Absolutely. Was it was contained in an unenforceable contract? You admit it. We do not. And there's a subtle distinction distinction here, Justice. The as Your Honor noted earlier during Mr. Fitzgerald's argument, the contingency fee agreement, the attorney client agreement was unenforceable because my clients were discharged before a recovery was made. There's no. Whoa, whoa, whoa. The agreement was unenforceable because your clients weren't advised in the retainer agreement as to how the fees would be split. That's why it was unenforceable. We disagree with that position. And I think a close look at 1.5 supports our position. I don't think you can disagree with that position. You've admitted in your briefs that it was an unenforceable contract. You admitted it before the trial judge. They admitted it before the trial judge. Yes, we admitted two things. We admitted that there was a failure to comply with rule 1.5. There was there is no disputing that. And the legal effect of that is that the contract is unenforceable. We did not admit that at the trial court. We have not admitted that in our briefs. And indeed, I don't believe that that's the case. Rule 1.5E, and this is supported by, among other cases, the Chambers versus Kay decision that Mr. Fitzgerald and the defendants cite to in support of their primary argument. Rule 1.5E governs agreements to share fees between lawyers. Now, does it relate to the agreement by clients to pay their lawyers' fees? Sure, it does. But in all of those cases in which a violation of rule 1.5E has been found, courts have concluded that the violation of rule 1.5E invalidates the agreement to share fees between lawyers. We agree with the perspective that a violation of rule 1.5E violates and invalidates an agreement to share fees between lawyers. There's a wide body of case law standing for that exact proposition. I think the foremost case in Illinois is the Naughton versus Paff decision in which they invalidated a referral fee agreement between Mr. Naughton and his firm and Bruce Paff and his firm. It is the same conclusion reached in the Chambers versus Kay case. Chambers versus Kay, Naughton versus Paff, and a number of these other decisions that we cited were involved fee disputes between lawyers. And there's a really key distinction there. In all of those cases, the lawyers as a group received the full fee that was provided for in the contingency fee agreement. None of those cases invalidated the attorney-client agreement and the provision in the attorney-client agreement that provided that the client has to pay the lawyers, either one or as a group. Well, let me ask you a question here. Assuming we would accept your theory, then in that particular case, the client would have to pay the entire fee to the lawyers. How would the lawyers divide that fee? Ultimately, that is going to be up to, in those cases, the lawyers were believed that they were going to be dividing the fee in accord with the agreement between the lawyers. One lawyer moved forward on the idea that that would be enough. So in other words, your theory is the rule is totally meaningless. You could enforce the contract is against the client and then the lawyers get to divvy up the fee. That's not our position at all. In fact, I believe that rule 1.5E, like all of the rules of professional conduct, is meaningful, extremely meaningful. The duty of competence, the duty of communication, the duty to avoid conflicts of interest. And likewise, rule 1.5E, the duty to inform clients in the manner in which a fee is going to be split. They are all important and they are all consequential. And a violation of any of those rules should be taken into consideration by a court of equity. Counsel, you appear to be attempting to run with the hounds and hide with the fox. And you can't do both in the same exercise. Let's assume we don't agree with you. And we find that the contract is unenforceable as against the client because it violates 1.5. Now the question becomes, what were you entitled to under quantum error, if anything? And I think unquestionably, the contract was not enforced. And so quantum error was the only way in which a recovery could be made. As your Honor suggested, if this court finds that the contract was unenforceable, not only because the recovery was not made before discharge, but also because of the violation of 1.5E, it doesn't change the ultimate outcome that the trial court reached here. The trial court in this case heard expert testimony as to what would constitute a reasonable fee under the circumstances presented here. First, there was a testimony of one of my clients, the principal of the Schlegel firm, Steve Schlegel. He testified that in similar matters, a contingency rate would constitute an accustomary and appropriate fee. We presented the testimony of our expert witness, John Brooks of Foley and Lardner, one of the foremost lawyers in the areas of trust estates and trust in estate business disputes in the entire nation. He likewise testified that a contingency fee structure, such as the one that the parties agreed to here, is usual and customary and reasonable in cases like this. Under a quantum Merowit analysis, which I think we all agree the trial court's findings as to each of the factors in the quantum Merowit analysis, and ultimately the trial court's conclusion as to what constituted a reasonable fee should not be disturbed absent an abuse of discretion. The trial court did not enforce in any way, shape, or form any term of a contingency fee agreement. The trial court conducted an appropriate analysis of the quantum Merowit factors, including what is the usual and customary charge for that type of work in the community. The court heard expert testimony on that point consistent with the court's ultimate judgment. 15% of the first 10 million plus 10% of any amount recovered beyond that is consistent with the usual and customary charge and would be a reasonable fee in this case. Now- Let me just stop you for one second. That's one of the seven factors. What about the hours spent? The hours spent is another factor to be considered and the court- But I want, yeah, I want to find out how a judge can come up with over $2 million with 3,000 hours claimed to have been expended, at least 1,200 of which were by an unpaid, gratuitous person. And when I multiplied in my head 3,000 hours by the highest rate, $600 an hour, I still got $1.8 million. I'm wondering how in the world could you possibly have taken into account the hours unless, you know, maybe the judge- Well, I can't tell. So I want to know how you address how the judge dealt with the testimony of the plaintiffs that somebody gave 173 hours seven times for free and yet the defendants have to pay and how it amounts to this $2 million plus. I can't, my math is not that good, but I can't figure it out anyway. Your math is excellent, Your Honor. And we acknowledge, if you look at the total fee that we sought and the total fee, the award that the court ultimately rendered, and if you apply the mathematical formula and you say, well, how much would this have been per hour? It is a large figure, unquestionably. The court in this case addressed that issue. The trial court did. The trial court entered testimony that the plaintiffs in this case would not have taken the defendants' litigation issues on a pure hourly basis. The defendants testified further that they could not find other lawyers who would take their case on a pure hourly basis. The reason for this is clear and it's undisputed. The defendants in this case professed to be without income and without other means when they first came to my clients. They didn't have any manner or means to pay a lawyer an hourly fee. The only way in which they could pay a lawyer and convince a lawyer that the lawyer should take their time, and in the case of Mr. Schlegel and his firm, essentially shut down his practice for 19 months to work exclusively or nearly exclusively on behalf of the O'Briens. The only way any lawyers would take that and the only ways that my clients were going to take a matter like that was on a contingency basis. It's the case in almost every plaintiff side piece of litigation. It's hard for me. I mean, I'm hearing you, but it's so hard for me when I look at their cost. I mean, their cost was under $8,000. What were they doing for 19 months and they only had $8,000 worth of costs? I would think they'd go out of business. These people weren't paying them any money. They must've been doing something else to sustain themselves for 19 months. In the case of the Schlegel firm, Steve Schlegel and his associate, they were doing essentially nothing else for 19 months. This was a lawyer and a law firm that were subsisting on their previous income, on the assets that they had already held, and they were risking everything to litigate these cases on behalf of the O'Briens who had no certainty of recovery. A fact that was testified to by Mr. Schlegel, by Mr. Levenfeld and by Mr. Brooks. There was no certainty that there would be any recovery. This was not a trust and a state's dispute per se. It was a freeze out case. They had to establish that the O'Briens were being frozen out and that as a result of the frozen, that they were being improperly frozen out. And that as a result of the improper freeze out, a court was compelled to order a distribution or a division of the assets. An incredibly difficult case to establish. The baseline in these cases is the court will say, there is no breach of fiduciary duty. This is not an improper freeze out. The O'Briens in this case could maintain their percentage ownership interests, but not receive any income, any distribution or any assets as a result. So this was a case of incredible risk for the lawyers. The lawyers made the decision that they'd be willing to take on this risk, knowing that it had at least a chance of a significant recovery. Indeed, a significant recovery that was ultimately made based on no small contribution from my clients. But they were only willing to take the case on a contingency fee basis. The O'Briens, I believe it was Maureen O'Brien, also testified that she had gone to other lawyers who were unwilling to take the case on an hourly basis. Maureen O'Brien testified that she would not have been able to pay a lawyer on an hourly basis in regular intervals. Dan O'Brien testified to the same thing. So we have two clients who want a lawyer to shut down his law firm to practice exclusively for them. And they acknowledge they could not pay an hourly fee. Now, as with almost every plaintiff's side case, the issue of risk, risk borne by the lawyer, merits what may be an ultimately very large legal fee. One that would not look reasonable if you simply applied an hourly rate. But there's an artifice there. You can't look at an hourly rate that was never going to have been paid. There was some testimony that Mr. Schlegel had proposed that he would accept an hourly rate, but the O'Briens testified that they could not have paid it. So they pivoted. And what they agreed to was the contingency rate that we've talked about here. Now it's a contingency rate that was memorialized in the fee agreement, but it's a contingency rate that is sort of odd in the broad spectrum of contingency fee cases. Because it was a contingency fee rate that was not proposed by the lawyers, put into an attorney-client agreement and shoved in the face of their potential clients with the demand that they agree to it or the lawyers will walk away. There was a negotiation. And the specific contingency rate that the parties agreed to and that was memorialized in the fee agreement was a contingency rate structure that Dan O'Brien, one of the two defendants, proposed. That is on Maureen O'Brien agreed to. They proposed that specific contingency rate structure to Mr. Levenfeld and to Mr. Schlegel who agreed. I thought, yeah, I thought maybe I have, I'll have to go back and look at the record, but I thought that the lawyers first proposed 15% on the first 10 million and 15% on the next however millions. And the young man said, no, we'll go with 15 on the first, but only 10 on the second. The lawyers, my clients had initially proposed a contingency fee structure after the two had agreed that an hourly rate would not, it would not work for either the clients or the lawyers in that case. They proposed a contingency fee structure.  was one proposed by Dan O'Brien. In response to a proposal by Mr. Schlegel. So you're right, your honor, there was a proposal of a specific structure at a higher ultimate rate by Mr. Schlegel. Mr. O'Brien proposed a lower rate that called for a lower figure in the event that there would be a recovery in excess of 10 million. Mr. Schlegel and Mr. Levenfeld discussed in the ultimate. So this is not a case where there was a 33 and a third percent, let's say, or even the 40% contingency that the clients in the Chambers and K versus K case paid. They paid a 40% contingency to their lawyers. Can I ask you a question? The cases that you've cited where the court allowed the attorneys to receive the contingency, even though they had been discharged. Can you cite me a single case, any one of yours, where the underlying contract was unenforceable? Well, I'll go back. In all of those cases, the underlying contract was unenforceable. In none of those cases. Wait a minute, why was the underlying contract retainer agreement in those cases unenforceable? My reading of those cases is every one of them, the underlying retainer agreement was enforceable. And then it was terminated by the client. Right after, we're going to give them the contingency anyway. We're going to give them the contingency because they were discharged after they did all the work. The underlying retainer agreements in those cases was not unenforceable at the instance. It may be a matter of semantics and I apologize. Let me make it more precise. Any one of those cases was the underlying retainer agreement unenforceable ab initio. Yes or no? The answer is no. Exactly. In none of those cases, did the court conclude that the retainer agreement was? I don't care what the court concluded. I want to know what the facts were. In this case, if it's found that the retainer agreement was unenforceable ab initio, then it is an entirely different case than the ones you rely on. They don't provide you any support. The question becomes, assuming that this contract was unenforceable ab initio, can the trial court in the exercise of its discretion award fees in accordance with the contingency contained in the unenforceable contract? That's the question. I think the answer to that question is absolutely yes. The court has considerable discretion in determining what constitutes a reasonable fee and in evaluating the quantum Merowith factors as the court did here and laid out in extreme detail in the memorandum judgment. Those conclusions that she reached on each of the factors should not be disturbed absent a conclusion that they were against the manifest way to the evidence, and they weren't. And I'll go back to something and I don't want to belabor the point, but that I said before. The court in this case did not enforce an unenforceable fee agreement. Whether we consider it unenforceable for a violation of rule 1.5B or for any other reason, the court did not enforce an unenforceable fee agreement. The court considered all of the quantum Merowith factors, including testimony as to what would constitute a reasonable fee. Now, we very likely could have obtained expert testimony who would have testified a 33% contingency would have been a reasonable manner of evaluating the benefit and the value provided to the O'Briens and thus would constitute an appropriate basis for a quantum Merowith recovery. We didn't. Our expert looked to what the parties had agreed to, whether that agreement was memorialized in the attorney-client agreement or not. The testimony that was received outside of the face of the attorney-client agreement is that this was a contingency structure that both the plaintiffs and the defendants found to be reasonable and fair. And so we started from that point. But it didn't matter that it was contained within an enforceable or unenforceable contingency fee agreement. What mattered is that the court heard and relied upon expert testimony that a contingency rate of 15% of the first 10 million and 10% of any amount beyond that is a fair, reasonable, usual, and customary rate. So I think the answer to your question then to sum that up is, yes, I think the court absolutely had the power to award a fee based on a rate that yes, it was contained in the unenforceable, unquestionably unenforceable attorney-client agreement. But that also had a basis in the expert testimony that was provided to the court. And I think that if this court is to disagree- Counsel, let me interrupt you for just a moment. Then think about Mr. Fitzgerald's earlier argument. It would seem to me that that argument would render 1.5 superfluous. It would have no meaning if the court could simply ignore the fact and award the award fees pursuant to the contingency in the first place. Would it not? It would not avoid the meaning of 1.5. And this is why. And the Chancery Court Judge at Turan considered the violation of 1.5 in rendering her ultimate decision. So this is not a case in which she simply set aside the fact that there was a violation of 1.5e and moved along as though that were not the case. She didn't do so. She looked at a wide body of case law that we cited to. I'm sure you don't need the sites at this point. But in which the courts looked to the question whether the violation was egregious and whether the violation caused prejudice to the clients or caused prejudice to the administration of justice in deciding number one, should that violation bar recovery entirely? And number two, should that violation serve as a basis to limit recovery? And what Judge Horan found based on a wide amount of testimony that she received is that the O'Briens knew that my clients were two different law firms, knew that my clients were going to share fees, did not care how fees were going to be split between the two lawyers. And that the reasons for rule 1.5 were satisfied even though 1.5e itself was not complied with. One of the reasons for 1.5e is so the clients know which lawyer or lawyers they can go to if they have a question. The idea there is that if a lawyer is to receive a portion of a fee, the clients may think that the lawyer who is to receive more of the fee would be more responsible. And the clients should have an understanding as to whether that's the case. In this case, both Dan and Maureen O'Brien testified that they knew that lawyers from both law firms were going to be ultimately responsible for their case. They were going to share responsibility. The lawyers did share responsibility. They were actively involved in the litigation. There were nine to 10 pieces of litigation. Counsel, we're back to your other argument that I don't think... At any rate, you're back to your entire argument that this contract was enforceable as against the clients. The contract was not enforceable and was not enforced. A quantum merit recovery was not barred. Exactly. And the trial court concluded based on a review of all of the factors as well as a review of the case law, providing that a violation of a rule of professional conduct, 1.5E, other provisions in 1.5, rules of communication, the rules of diligence, the rules regarding confidentiality of information, conflict of interest, a violation of any of those rules should be taken into consideration in a quantum merit trial. And the court did take them into consideration. The court ultimately concluded that the violation was not sufficiently egregious, made a factual finding. It was not sufficiently egregious. What violation was not sufficiently egregious? The violation of 1.5E, the failure to disclose. Wait a minute. Either the contract was unenforceable or it wasn't. If it's unenforceable, it doesn't make any difference how egregious it is. It's unenforceable. And in this particular case, I'm looking at this trial judge's order. This trial judge went down the factors that you're supposed to consider for determining what a fee is in quantum merit, turns around and says, the usual and customary charge, Siegel says, Schlegel rather, says it's 450 to 600 an hour, 250 for associates, $85, makes a finding that they put in 3,000 hours total and that the timesheets are clear and then awards a contingency fee. Now, the usual and customary fees for that type of work in the community is the usual and customary fee, 15%. Usual and customary fee, 10%. What is it? What was the testimony? Sorry, your honor, the testimony. What was the testimony? The testimony and this included testimony from John Brooks, again, one of the foremost trust estates and business disputes litigators in the United States was that in matters like this that involved freeze outs and questionable recovery, 33 and a third percent, the figure often used in a personal injury contingency fee case, 33 and a third percent would be usual, customary and reasonable for a case like this. Applying to conclude that that should be the recovery here to the extent that that was his province because he said the parties had agreed to something different and he didn't think that it would be fair, but he testified- Well, wait a minute, wait a minute. The parties agreed to something different so that made what they agreed, the usual and customary fee? Does that make sense? The court and the expert looked to what the parties had agreed to, whether that's- The court has a specific provision in its order as to what it found as to the usual and customary fee. It wasn't 33%. It wasn't 15%. It was hourly rates of 450 to six, 250 for associates, 85 for paralegals. That's what the court found. It's on page 14 of her order, number six, I believe. She found what the number of hours were that were worked. She went down the line of the factors to be considered and then ignored them and awarded the contingency fee which to me, either the contingency fee was part of an unenforceable agreement or it wasn't. I don't understand the argument how 15% and 10% became the usual and customary fee. 15% and 10% was consistent with the usual and customary fee and that is one of the many factors that the court within her discretion could look at and findings upon which should not be disturbed except to the extent that they're against the manifest way to the evidence. Did the court look at usual and customary hourly fees? Absolutely. The court also concluded that that is not determinative in a case like this given other factors and given the body of the evidence that the court heard including the risk to the lawyers. Counsel, that's not what the judge said. The judge said, considering the quantum merit factors identified above and those were usual and customary fees, number of hours, et cetera and so on and taking into account defendant's own views as to what would be a fair and reasonable fee at the outset, the court finds that the amount of the contingency fee is a reasonable fee. And I think it's- Yeah, go ahead. I think it's the clause where the court notes and taking into consideration what the defendants found to be a reasonable fee at the outset where the court is pivoting and saying, although we looked at hourly fees, what the defendants believed would be a reasonable fee should be taken into consideration and what they believed would be a reasonable fee was a contingency fee. I suppose the difficulty I have with your argument is in quantum merit, reasonable fee is not the measure. It's the value of the services, the value of the service because I say and I agree with someone else that $10 is reasonable for this article doesn't mean the $10 is the value of the article and it's value of services that must be established in order to justify a fee in quantum merit. So what was the value of the services that the client's running? Ultimately, the value is what was determined by the trial court. And I think that it would be disingenuous for me to say that any particular services, the ones rendered here or in any other matter have a specific set value. In this case, the court relied upon a number of other decisions in which the court said that value can be measured by reference to what the parties thought would be a reasonable fee. And that is what the court did here. The value of the services, the value as the defendants in this case anticipated the services, the defendants anticipated the value of the services would be measured by a percentage recovery. There was value to them in not paying an hourly rate, because if they needed to pay an hourly rate, they couldn't get a lawyer. There was value to them in being able to pay lawyers at the end and only if they recovered. There was value to them in having lawyers who had a vested interest in the litigation. And I think, and Your Honor made an excellent point that the measure of recovery in quantum merit is not what is a reasonable fee is what is the value. But I think that it would be unjust and inequitable for the court to have tried to determine what is the value provided without looking at the circumstances that these specific parties were in. You can't detach a determination of value from the specific circumstances. And the specific circumstances were that a lawyer had to set aside his entire law firm and make no money, risking a year and a half of his professional life and of his associates' professional life and of his secretary's work to take a case that had no certainty of recovery and had a possibility of recovery many, many, many years in the future if they hadn't been able to get to a point where they compelled the opponent to settle. So I think that we have to take into account as the court did here in an assessment of value, what did the parties value? And the parties did not find that there would be value in having a pure hourly rate for all the reasons that I expressed. The parties did find value as in almost any contingency fee arrangement. They found value in the plaintiffs not having, or the plaintiffs in the underlying cases, the defendants here, not having to pay a lawyer unless the recovery was made. Okay, counsel, I think, okay. All right, I understand your position. All right, Justice Martin, do you have any further questions? All right, thank you, Mr. Boter and Mr. Fitzgerald. There was a lot said, so you can take more than three minutes if you'd like. Thank you. Thank you, Your Honor. I want to start by addressing a question that Justice Hoffman asked, and it's a simple question. And the answer is, what is the value of the services provided? And the answer, I think, is the plaintiffs had the burden to prove that, and they never did without reference to this unenforceable fee agreement. Counsel, that's not true. According to the trial judge's order, she went down the list of the factors for consideration in awarding fees under quantum merit, and then awarded the contingency fee. Now, if we were to make a determination that these defendants or these plaintiffs are entitled to an award of fees under quantum merit, but it shouldn't be the contingency fee, what's the remedy? Well, the plaintiffs could have done a couple of things. They could have sought a recovery based on the hours. They never did that. They forfeited that. They disavowed it. I'm looking at page 15 of the judge's order. Quote, the award is not based on recorded hours. In fact, one of the two plaintiffs, Mr. Levenfeld, never even testified to what his usual and customary hourly rate is. So the plaintiffs never sought a recovery based on hours. They exclusively sought a recovery based on the contingency. They forfeited any claim. Whenever at trial, the O'Brien's attorney tried to question witnesses about the hours records, there was an objection on the basis that, again, the plaintiffs were not asking for any recovery calculated by hours. And as Justice Lamkin alluded to, there's no way that you could get to the amount awarded here by looking at the hours. About half those hours were recorded by a volunteer for overhead, for file maintenance. Justice Lamkin asked a great question. Over 19 months, what exactly did these lawyers do? It's really hard to tell from the record what exactly they did. No depositions, no rulings in the O'Brien's favor. Even the settlement correspondence contains no analysis of why the Schultz's should agree to the O'Brien's settlement positions. So again, what is the value of the services? That was the plaintiff's burden to prove. They never gave the court any legally valid basis to answer that very basic question in this case. And I would briefly refer to Vandenberg versus RQM, one of the cases we cited, paragraph 48, where a law firm pursued the same strategy, sought a quantum merit award based on a contingency fee, lost and then said, okay, please give us another bite at the apple on remand. And this court said, no, you have forfeited any award based on hours because you didn't seek it. They disavowed any award based on fees. Because of course, if you look at the hours and if you take out the volunteers hours, you can't get any amount of money that approximates the amount of money that they wanted to get under their unenforceable contingency fee agreement. I like to respond to a couple of things that counsel said. Counsel repeatedly said that the plaintiff's here made no money from anything else during the 19 months. There was no testimonies that affected trial at all. Counsel talked about the risk that the plaintiffs here were taking on. They received a $30,000 payment upfront. That's reflected in the fee agreement. So they got some money upfront. There's also a so-called disaster clause that says that the lawyers get the contingency or a recovery based on hours, whichever one is greater. And again, these were uncontested interests in the states. No one was disputing that Maureen and Dan O'Brien each had a 25% interest in their parents' estates and in the trust. That was never in dispute. So there was no risk of non-recovery. Counsel talked about testimony at trial, including by an expert witness named Brooks. Mr. Brooks just referred back to the contingency. He just circled back to the contingency, which we know is unenforceable. And of course, that's not permissible. That would reduce Rule 1.5e to some advisory guidepost. And I'd like to point out something else. Justice Hoffman pointed out that all the cases cited by the plaintiffs were in cases where the underlying contingency fee agreement was perfectly valid. It didn't violate any rule of professional conduct at all. There's an additional distinction to make about all those cases. And all those cases, Wooliver v. Northwestern, Estate of Kelso, the lawyer who was fired got the settlement done, obtained the settlement offer that the client eventually accepted. Here, that never happened. Again, all settlement offers were withdrawn. Even the best settlement offer that these plaintiffs ever got for the O'Briens was totally unacceptable. It would have rendered one of their clients homeless. And so for all those reasons, there simply was no evidentiary basis. For the court to value services rendered by the plaintiffs here. And again, based on all the evidence, really the value is zero. The plaintiffs achieved nothing for the O'Briens. In fact, by having Maureen resign as co-executor, they in fact harmed the O'Briens. And by launching settlement discussions without even having any evaluation done of the value of the assets that they were bargaining away. And so for all those reasons, we ask this court to reverse the judgment of the circuit court. And I'm happy to answer any further questions that any member of the panel may have. You just made me think of a question and I'm trying to formulate it. If there is an invalid contingency agreement, which I think we probably all agree to, that is unenforceable. If they proceeded on quantum merited, but then you're saying they forfeited the hours. Are you saying this is just reversed outright and they don't get a remand for the judge to reconsider the quantum merited factors without referring to the unlawful contingency agreement? Is that what you're saying? Yes, Your Honor. And again, that was the outcome in the Vandenberg case, paragraph 48, where a law firm tried a personal injury case, took it to verdict. That was the famous case where there was an issue concerning a question from the jury. So a law firm tried a case through trial and got a settlement offer under controversial circumstances. They sued the client in quantum merit. The fee agreement was perfectly valid. It just wasn't operative because the client fired the lawyer, but the fee agreement did not violate any rule of professional conduct. The lawyer sought the contingency fee as a measure of the quantum merit award lost at the trial court that was affirmed by this court. And this court said, and this court used the expression, no second bite at the apple. This court said we would have to disregard all the rules of forfeiture if we sent this back to the circuit court for the lawyer to come up with some new way of measuring the value of services that the lawyer previously never pursued. And in fact- Counsel, if that's the case, what was the purpose of introducing evidence on all of these factors for consideration in the quantum merit award? Oh, I'm sorry. What was the purpose of it? That's a great question, Your Honor. I believe all the evidence on ours was submitted by the plaintiffs and I can't speak to what their motivation was. What I do know is that they consistently throughout the trial, both in their arguments and what they asked for in the testimony of their expert witness at every term, they said we're not seeking any recovery based on ours, just the contingency. So why did they introduce that evidence? The honest answer, Your Honor, is I'm not sure. What I do know is, again, Levenfeld never even said what his reasonable hourly rate was. So they never sought a recovery on that basis. Justice Martin, do you have any additional questions? I don't have any additional questions. I have one. Tom, I'm sorry, Justice. Oh, I thought you said, all right. For Mr. Fitzgerald and Mr. Broder, this is a very interesting case. I could listen to the both of you go back and forth for the next hour, but we have more things to do. So we are going to stand in recess and shortly you will have a decision on this matter. Thank you both very much.